USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT ____________________ No. 94-1326 UNITED STATES, Appellee, v. JAMES K. SMITH, Defendant, Appellant. _____________________ No. 94-1327 UNITED STATES, Appellee, v. ROBERT COHEN, Defendant, Appellant. ____________________ No. 94-1328 UNITED STATES, Appellee, v. AMBROSE DEVANEY, Defendant, Appellant. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. William G. Young, U.S. District Judge] ___________________ ____________________ Before Selya, Circuit Judge, _____________ Bownes, Senior Circuit Judge, ____________________ and Stahl, Circuit Judge.  _____________ ____________________ Charles W. Rankin, with whom Rankin & Sultan, Sheldon Krantz, and _________________ ________________ ______________ Piper & Marbury, were on brief for appellant Robert Cohen; Joseph J. ________________ _________ Balliro, with whom Balliro, Mondano & Balliro, P.C., was on brief for _______ ________________________________ appellant James K. Smith; and Emmanual N. Papanickolas, for appellant ________________________ Ambrose Devaney. Paul G. Levenson, Assistant United States Attorney, with whom _________________ Donald K. Stern, United States Attorney, and Victor A. Wild, Assistant _______________ ______________ United States Attorney, were on brief for appellee. ____________________ February 10, 1995 ____________________ BOWNES, Senior Circuit Judge. After a joint trial, BOWNES, Senior Circuit Judge.  ____________________ defendants James Smith, Robert Cohen, and Ambrose Devaney were convicted of defrauding two federal credit unions and other related offenses. Although some aspects of the trial give us pause, we affirm the convictions and sentences. I. FACTS I. FACTS _____ We review the facts in the light most favorable to the government. United States v. Ford, 22 F.3d 374, 382 (1st _____________ ____ Cir.), cert. denied, 115 S. Ct. 257 (1994). Between December _____ ______ 1985 and March 1991, James Smith, Richard Mangone, Robert Cohen, and Ambrose Devaney fraudulently obtained tens of millions of dollars in real estate loans from the Barnstable Community Federal Credit Union (BCCU) and the Digital Employees Federal Credit Union (Digital). Smith, a real estate developer, and Mangone, President of Digital, were co- founders of BCCU. Robert Cohen was general counsel to both credit unions. Smith and Mangone controlled much of BCCU's lending through Lynn Vasapolle, a coconspirator who was BCCU's manager. Devaney was a real estate developer, the only defendant who was an outsider to the credit unions. The loans were used in part to finance the purchase of commercial real estate on Cape Cod. To circumvent the credit unions' policies restricting "insider" loans or limiting maximum borrowing by an individual, Smith, Mangone, and Devaney formed more than a dozen nominee trusts to create -3- 3 the impression that the loans were going to many different borrowers. Cohen, who served as closing attorney for the credit unions, prepared the trust instruments and closing binders. He also instructed Vasapolle what documents to include in her BCCU files. The conspirators concealed their interest in the trusts by representing the trustees as putative owners. At Mangone's direction, Vasapolle prepared false certificates of beneficial interest on a blank form that Cohen had provided. There was evidence that in some cases Cohen directly submitted false certificates to BCCU, while maintaining parallel sets of genuine and false certificates in his files. In one case where he served as trustee, Cohen signed a certificate misrepresenting himself and his wife as the beneficiaries of the trust. For their part, Smith and Vasapolle prepared false financial statements for BCCU showing that the trustees qualified for the loans. Smith altered the purchase and sale agreements, sometimes inflating the purchase price by millions of dollars, in order to obtain larger loans. The excess loan proceeds were usually deposited in Cohen's client account, transferred to one of Smith's accounts, and then distributed to Smith, Mangone, and Devaney. In the late 1980's, the real estate market on Cape Cod collapsed. Unable to sell the properties and faced with -4- 4 mounting debts, Smith, Mangone, and Devaney resorted to a pyramid scheme. Cohen created new trusts that purported to buy subdivisions from the old trusts; the sham "sales" were in turn financed by new loans from the credit unions. By March 1991, when BCCU was seized by regulators from the National Credit Union Administration (NCUA), the outstanding balance on the Smith-Mangone-Devaney loans had reached forty to sixty million dollars. On September 12, 1992, Smith, Mangone, Cohen, and Devaney were indicted for conspiracy (18 U.S.C. 371) to commit bank fraud (18 U.S.C. 1344); unlawful receipt of monies by a credit union officer (18 U.S.C. 1006); and unlawful monetary transactions (money laundering) (18 U.S.C. 1957). Each defendant was also charged with various offenses underlying the conspiracy. The case was tried on a redacted indictment that included a conspiracy count, seven bank fraud counts, seven parallel unlawful receipt counts (which concerned Mangone alone), and the money laundering charges. Vasapolle testified under a plea agreement and explained the workings of the conspiracy. Smith and Mangone were convicted on all counts. Cohen was convicted on all counts except for four money laundering counts. Devaney was convicted of conspiracy, three counts of bank fraud and one count of money laundering. Mangone fled before sentencing. Smith was sentenced to -5- 5 fifteen years imprisonment and three years supervised release, and ordered to pay up to twenty million dollars in restitution. Cohen was sentenced to ten years imprisonment. Devaney was sentenced to thirty-seven months imprisonment and three years supervised release, and was ordered to pay up to ten million dollars in restitution. II. DISCUSSION II. DISCUSSION __________ These appeals turn largely on whether the defendants should have been severed for separate trials under Fed. R. Crim. P. 14. Cohen also argues that certain evidentiary rulings and jury instructions deprived him of a fair trial. Devaney argues that various counts of the indictment were multiplicitous, and that the evidence was insufficient to support his convictions. Each defendant challenges his sentence on various grounds. A. Bruton error A. Bruton error ______ We begin with Smith's claim of error under Bruton ______ v. United States, 391 U.S. 123 (1968) -- the heart of his _____________ argument for severance. Bruton held that, because of the ______ substantial risk that a jury, despite contrary instructions, will look to a codefendant's incriminating extrajudicial statement in determining a defendant's guilt, admission of the codefendant's statement in a joint trial violates the defendant's right of cross-examination under the Confrontation Clause of the Sixth Amendment. Id. at 126. As ___ -6- 6 the Court emphasized in Richardson v. Marsh, 481 U.S. 200, __________ _____ 208 (1987), Bruton error occurs where the codefendant's ______ statement "'expressly implicate[s]'" the defendant, leaving no doubt that it would prove "'powerfully incriminating'" (quoting Bruton, 391 U.S. at 124 n.1, 135). There is no ______ Bruton error if the statement becomes incriminating "only ______ when linked with evidence introduced . . . at trial." Richardson, 481 U.S. at 208. See United States v. __________ ___ ______________ Limberopoulos, 26 F.3d 245, 253 (1st Cir. 1994) (Bruton _____________ ______ protects against the "powerfully incriminating effect of [a nontestifying] accomplice pointing the finger directly at another"; by contrast, "inferential incrimination . . . can be cured by limiting instructions"). Against this backdrop, we turn to the claimed Bruton error. The trial began on May 17, 1993. During the ______ government's case, Vasapolle testified that she, Cohen, Smith, and Mangone met twice after the BCCU takeover to discuss the possibility of removing or destroying loan documents from the BCCU's and Cohen's files. Cohen allegedly agreed to remove some of his documents, but advised his coconspirators that it would be impossible to purge all of the files. He also refused to destroy any documents because to do so would be an obstruction of justice. On June 28, 1993, the last day of testimony, Cohen called Professor Richard Huber, an authority on professional -7- 7 responsibility. Huber testified subject to a limiting instruction that his testimony "has nothing to do with . . . Mr. Smith [and] Mr. Devaney." According to Huber, Cohen called him in late March of 1991 and "indicated that he had a serious problem with professional responsibility that was facing him and he would like to have an opportunity to discuss it." Cohen met with Huber on April 4, 1991. Huber testified: Mr. Cohen explained that he had been involved as a lawyer for a banking institution . . . . [O]n the 23rd of March [1991], a former officer of the bank, a former director of the bank, and a bank manager came in and spoke to him . . . concerning activities that involved them and their work at the bank. *** [E]ssentially it amounted to the issue that certain documents had been changed, the information had been changed, figures had been changed, data had been changed, that this had been done after preparation by Mr. Cohen and after they had been presumptively completed, as far as he was concerned, and were in file -- in his files, the bank files. He indicated that it was a possibility, though he wasn't certain, as I can recall this, that there may have been also forgeries, in terms of signatures including possibly his own. But the main thrust . . . was that documentation which he had prepared and which was complete and on file, had been changed by these three people in their indication to him when they met with him. Cohen asked "whether he could reveal any of this information, which had been received from these persons as -8- 8 clients." Huber advised him that "there was no way in which he could reveal confidences at that point in time," but that he could do so "if it was necessary to protect himself, that is, where he would be charged with crime or where he would be sued civilly." After Huber testified, Cohen's codefendants moved for a mistrial, citing Bruton. The court deferred its ruling ______ until Cohen's next witness had testified. Just before Cohen's closing argument, the court instructed counsel "[not to] argue what Cohen said to Huber," because that evidence would be stricken. The court then stated, "[Y]ou may argue what Huber said to Cohen." The next day, the court instructed the jury that Huber's testimony of what Cohen "said to him about other persons [is] . . . stricken entirely." Left in evidence was "the fact that Mr. Cohen went to Huber, the fact that he made disclosures to Mr. Huber . . . and the testimony of Mr. Huber about what he said to Mr. Cohen . . . ." As it explained at sidebar, the court submitted the case to the jury because the Bruton error (if ______ any) occurred during the last day of testimony in a lengthy trial, and might be mooted by an acquittal. In addition, the harmfulness of the error would be more apparent in light of the verdicts. All of the defendants were convicted, and Smith moved for a new trial. The district court opined that there -9- 9 had been an "egregious error" under Bruton. In the court's ______ view, however, the Bruton evidence was "merely cumulative" of ______ the government's case and therefore harmless beyond a reasonable doubt. In the classic Bruton scenario, Cohen would have ______ made a detailed confession of bank fraud, naming Smith as an accomplice. The government could not introduce such an incriminating statement at a joint trial, even against Cohen alone. In fact, Cohen -- not the government -- offered his own statement that three unnamed clients came to him and essentially confessed to bank fraud. The government emphasizes the self-serving nature of this evidence, while Smith dwells on the power of a confession offered to one's own attorney at a time of presumed confidence. To us, these factors seem more or less a wash. We shall assume without deciding that the district court correctly found that Bruton ______ error had occurred.1 Cohen's statement could be found to be  ____________________ 1. The government asks us to hold that the Bruton statement ______ must actually name the defendant. We regard this as an open question that we need not answer at this time. See ___ Richardson, 481 U.S. at 211 n.5 ("We express no opinion on __________ the admissibility of a confession in which the defendant's name has been replaced with a symbol or neutral pronoun."); United States v. Cleveland, 590 F.2d 24, 28 n.4 (1st Cir. _____________ _________ 1978) ("A Bruton problem is, of course, not necessarily ______ avoided merely by deleting names."). Cf. United States v. ___ _____________ Limberopoulos, 26 F.3d 245, 253 (1st Cir. 1994) _____________ (codefendant's statements "neither name nor impugn ____________ [defendant] directly") (emphasis added). But see United ___ ___ ______ States v. DiGregorio, 605 F.2d 1184, 1190 (1st Cir.) ("where ______ __________ the confession does not name a codefendant, it may be ___ admitted under Cleveland solely against the confessor"), _________ -10- 10 "powerfully incriminat[ing]" on its face, even without "inferential incrimination" from other evidence in the case. Richardson, 481 U.S. at 208. __________ We are nonetheless convinced that any error was harmless beyond a reasonable doubt. See Harrington v. ___ __________ California, 395 U.S. 250 (1969) (Bruton errors are subject to __________ ______ harmless-error analysis under Chapman v. California, 386 U.S. _______ __________ 18 (1967)). The jury convicted all the defendants on the conspiracy count, and Cohen on most of the substantive counts. Even if the jury threw the curative instructions to the wind2 and considered the stricken testimony as evidence against Smith, the scenario which implicates Bruton, it could ______ not have believed Cohen's claim that the unnamed clients confessed to him at the close of the conspiracy. No one _________ confesses to a partner in crime. Cf. DiGregorio, 605 F.2d at ___ __________ 1190 (finding any error in admitting codefendant's statement harmless; noting that the defendant was acquitted of the substantive act of participating in the shooting). Admittedly, Cohen's statement might tend to incriminate Smith and Devaney by showing that the co- conspirators met to discuss damage control. In this sense,  ____________________ cert. denied, 444 U.S. 937 (1979). _____ ______ 2. We recognize, of course, the strong presumption that jurors will follow the trial court's limiting instructions. See, e.g., United States v. Sepulveda, 15 F.3d 1161, 1185 ___ ____ _____________ _________ (1st Cir. 1993), cert. denied, 114 S. Ct. 2714 (1994). _____ ______ -11- 11 however, the statement falls far outside the pale of the "powerfully incriminating" evidence that produces Bruton ______ errors. Vasapolle had already testified in detail to the coconspirators' meetings in the wake of the BCCU takeover. Thus, once Cohen's statement is considered as something other than an account of the codefendants' confessions, it becomes merely cumulative of the government's case and could not have produced Bruton error. See DiGregorio, 605 F.2d at 1190 ______ ___ __________ (fact that a codefendant's admission tended to corroborate government's case against the defendant is insufficient, standing alone, to trigger Bruton); United States v. Rawwad, ______ _____________ ______ 807 F.2d 294, 296 (1st Cir. 1986) ("[t]he mere fact of corroboration is not enough to warrant finding a Bruton ______ violation"), cert. denied, 482 U.S. 909 (1987). _____ ______ The right of confrontation ensures that a criminal defendant can cross-examine his or her accusers. Had Cohen testified to the confession himself, Smith's cross- examination of Cohen would have sought to show that no confession ever occurred. The verdicts suggest that the jury, if it considered this evidence, found just that. The jury, even if it disregarded the limiting instructions, plainly did not believe Cohen's claim that his codefendants had confessed to him. It is clear, therefore, that any Bruton error was harmless beyond a reasonable doubt. ______ B. Severance B. Severance -12- 12 We now consider whether the district court should have granted a severance based on the alleged prejudice created by a joint trial. "[A] district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro ______ v. United States, 113 S. Ct. 933, 938 (1993). The denial of ______________ a motion for severance "'will be overturned only if [the district court's] wide discretion is plainly abused,'" United ______ States v. O'Bryant, 998 F.2d 21, 25 (1st Cir. 1993) (quoting ______ ________ United States v. Natanel, 938 F.2d 302, 308 (1st Cir. 1991), ______________ _______ cert. denied, 112 S. Ct. 986 (1992)), "'depriv[ing] defendant _____ ______ of a fair trial [and] resulting in a miscarriage of justice.'" United States v. Tejeda, 974 F.2d 210, 219 (1st _____________ ______ Cir. 1992) (quoting United States v. McLaughlin, 957 F.2d 12, _____________ __________ 18 (1st Cir. 1992)). 1. Antagonistic defenses 1. Antagonistic defenses Smith and Devaney argue that their defenses were antagonistic to Cohen's. In his opening statement, counsel for Cohen characterized his client as an innocent third party, forced by the government to play the role of an assistant prosecutor. "Mr. Cohen's theory of defense is if __ this [the bank fraud] happened, then he was not part of it." (Emphasis added.) Counsel also stated that the codefendants -13- 13 had falsified loan documents; that Smith asked Cohen to destroy certain files; and that Cohen, stunned by these revelations, sought the advice of a law professor regarding his professional responsibility. Opening statements, of course, are not evidence. The true level of antagonism between the defenses is measured by the evidence actually introduced at trial. See United ___ ______ States v. Torres-Maldonado, 14 F.3d 95, 104-05 (1st Cir.), ______ ________________ cert. denied, 115 S. Ct. 193 (1994). Moreover, "mere _____ ______ antagonism of defenses does not require severance." United ______ States v. Yefsky, 994 F.2d 885, 896 (1st Cir. 1993). See ______ ______ ___ United States v. Angiulo, 897 F.2d 1169, 1195 (1st Cir.) ______________ _______ (collecting cases in which we have denied severance despite "sharply antagonistic defense theories"), cert. denied, 498 _____ ______ U.S. 845 (1990). "[T]he tension between defenses must be so great that a jury would have to believe one defendant at the expense of the other." Yefsky, 994 F.2d at 897 (citing ______ United States v. Arruda, 715 F.2d 671, 679 (1st Cir. 1983)). _____________ ______ We recognize that this is not a case of mere tattling or "finger-pointing" between defendants. Cohen offered testimony suggesting that Smith (among other codefendants) had actually confessed to him. For several reasons, however, Smith has not made the "strong showing of prejudice," McLaughlin, 957 F.2d at 18, required to obtain a __________ severance. -14- 14 We emphasize that the key testimony antagonistic to Smith -- what Cohen allegedly told Huber -- is not part of this case. That testimony was originally admitted only in Cohen's case, and only for the fact that Cohen had made certain assertions to Huber -- not for the truth of those assertions. We have found the testimony harmless, even if it may have been wrongly admitted initially. See supra, section ___ _____ II.A. Finally, the district court struck the testimony altogether. Assuming that some prejudice remained for purposes of severance, see Zafiro, 113 S. Ct. at 938 (Bruton- ___ ______ ______ related problems "might present a risk of prejudice") _____ ____ (emphasis added), Rule 14 "does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." Id.  ___ As our Bruton discussion shows, the jury ______ demonstrated by its verdicts that it did not believe Cohen's "confession" defense, assuming that it improperly considered it at all. Cf. Zafiro, 113 S. Ct. at 939 (finding ___ ______ convictions supported by the evidence and rejecting claim that the jury found at least one of the defendants guilty without regard to whether the government proved its case beyond a reasonable doubt) and 940 (Stevens, J., concurring) ("in any event, the jury in this case obviously did not believe Soto and Zafiro, as it convicted both of them. -15- 15 Accordingly, there is no basis . . . for concluding that the the[ir] testimony . . . prejudiced their codefendants."). Moreover, if the jury in fact followed the limiting instructions, there was simply no significant evidence that was antagonistic to Smith. It in no way appears that the jury "unjustifiably infer[red]" -- from the alleged antagonism alone -- that both Smith and Cohen were guilty. United States v. Talavera, 668 F.2d 625, 630 (1st Cir.), _____________ ________ cert. denied, 456 U.S. 978 (1982). _____ ______ In sum, Smith, the only appellant arguably incriminated by Huber's testimony about what Cohen said to him, failed to demonstrate strong prejudice from the joint trial on the basis of Bruton and the antagonistic defenses. ______ His and Devaney's parallel arguments for severance must therefore be rejected. 2. Codefendant testimony  2. Codefendant testimony Cohen argues that the joint trial deprived him of Smith's exculpatory testimony. In support of Cohen's pretrial motion for severance, Smith furnished two affidavits representing that, if he were tried first, he would testify on Cohen's behalf at a later trial. To obtain a severance on the basis of a codefendant's testimony, the defendant must demonstrate: (1) a bona fide need for the testimony; (2) the substance of the testimony; (3) its exculpatory nature and effect; and (4) -16- 16 that the codefendant will in fact testify if the cases are severed. United States v. Drougas, 748 F.2d 8, 19 (1st Cir. _____________ _______ 1984). We shall refer to these as the "first-tier" Drougas _______ factors. Upon such a showing, the district court should (1) examine the significance of the testimony in relation to the defendant's theory of defense; (2) consider whether the testimony would be subject to substantial, damaging impeachment; (3) assess the counter arguments of judicial economy; and (4) give weight to the timeliness of the motion. Id. These are "second-tier" Drougas factors. ___ _______ The district court found that Cohen had satisfied the first tier of criteria under Drougas.3 It denied the _______ motion for severance, however, because Smith's proffered testimony was "more circumstantially than directly" exculpatory. The court also weighed two other factors --  ____________________ 3. If the offer to testify is conditioned on the order of the separate trials, there is an open question whether the codefendant's availability meets Drougas' first-tier _______ requirements. We note, however, that several of our sister circuits have ruled that an offer to testify, conditioned on one defendant being tried before the other, fails to satisfy the elements of a prima facie case for severance. See, e.g., ___ ____ United States v. Washington, 969 F.2d 1073, 1080 (D.C. Cir. ______________ __________ 1992), cert. denied, 113 S. Ct. 1287 (1993); United States v. _____ ______ _____________ Blanco, 844 F.2d 344, 352-53 (6th Cir.), cert. denied, 486 ______ _____ ______ U.S. 1046 (1988); United States v. Haro-Espinosa, 619 F.2d ______________ _____________ 789, 793 (9th Cir. 1979); United States v. Becker, 585 F.2d _____________ ______ 703, 706 (4th Cir. 1978), cert. denied, 439 U.S. 1080 (1979). _____ ______ Here, the district court found that Cohen had satisfied this requirement, notwithstanding Smith's conditional proffer. Because the court correctly denied severance on the basis of second-tier Drougas factors, see infra, we need not consider _______ ___ _____ whether such a conditional proffer necessarily fails the Drougas test. _______ -17- 17 concerns for judicial economy in a lengthy conspiracy trial, and the fact that Cohen himself could testify to some of the issues raised by Smith. It decided that these factors militated against severance. The district court relied primarily upon factors specifically authorized by Drougas. Judicial economy is _______ obviously not dispositive, but it is important in a lengthy conspiracy trial. Most tellingly, the district court found that under the second tier of Drougas factors, Smith's _______ artfully-worded affidavits were not significant when considered in relation to Cohen's theory of defense. Smith averred that there was "no agreement . . . wherein Cohen agreed to provide documentation" to the credit unions "that he knew was prepared in such a way so as to conceal . . . the true recipients" of the loans. This adds little to Cohen's plea of not guilty. To be "significan[t] in relation to the defendant's theory of defense," Drougas, 748 F.2d at 19, the _______ codefendant's proffer has to do more than assert ultimate facts. Cf. United States v. Ford, 870 F.2d 729, 732 (D.C. ___ ______________ ____ Cir. 1989) (conclusory statements did not meet burden of establishing the exculpatory "nature and effect" of the codefendant's testimony). It should furnish facts that could significantly advance the theory of defense. With its first- _____________________ hand exposure to the case, the trial court is in the best -18- 18 position to make this assessment. See O'Bryant, 998 F.2d at ___ ________ 25. Cohen argues that it was an abuse of discretion for the district court to consider his ability to testify to the issues raised by the Smith affidavits. First, his own testimony would necessarily seem self-serving; second, a defendant's right not to testify might be infringed if his ability to testify is given significant weight by a court performing a Drougas analysis. We assume that the _______ defendant's ability to testify is an improper factor under Drougas. The district court, however, was primarily _______ dissatisfied with Smith's proffer. See infra. Because ___ _____ severance could have been denied on that basis alone, we do not think the court accorded "significant weight" to an improper factor. United States v. Gallo, 20 F.3d 7, 14 (1st _____________ _____ Cir. 1994) (quoting United States v. Roberts, 978 F.2d 17, 21 _____________ _______ (1st Cir. 1992)). Smith's affidavits were admittedly not without exculpatory value. The second affidavit stated that "Robert Cohen sent closing packages to Lynn Vasapolle . . . which included copies of the Certificate of Beneficial Interest in which the names of some of the co-defendants were included" ____ (emphasis added). Vasapolle allegedly informed Cohen in or about 1989 that BCCU would no longer require such certificates to be included in the closing packages. -19- 19 Finally, Smith averred that "despite the instructions from Cohen[,] Vasapolle would alter and remove files from BCCU." As the following colloquy shows, however, even the most promising portions of Smith's affidavits offer less than meets the eye: Court: I understand that that's a _____ significant part of [Cohen's] defense. Counsel: Yes, it is, your Honor. _______ Court: That the closing packages were _____ all sent in an appropriate form. Counsel: Exactly. _______ Court: And after they left Mr. Cohen's _____ hands, this witness and other conspirators altered them. I have been looking in these affidavits for support for that proposition. And while there is some circumstantial evidence that is consistent with that proposition, nowhere _______ does Mr. Smith say that. Paragraph 3 [of _______________________ the second affidavit] doesn't say it, especially if we're talking [about] the period once the investigation [of BCCU] started. (Emphasis added.) We think that the district court's on-the-spot assessment of severability was beyond reproach. We recognize that there were "very real arguments" in favor of severance, such that in the exercise of its discretion, the court could _____ have ordered separate trials. The very closeness of the question, however, convinces us that there was no abuse of discretion. -20- 20 Finally, Devaney argues that severance should have been granted because he wished to call Cohen as a witness to show that he relied in good faith upon the advice of counsel. This argument was not made to the district court and, therefore, has been waived. United States v. Zannino, 895 _____________ _______ F.2d 1, 17 (1st Cir.), cert. denied, 494 U.S. 1082 (1990). _____ ______ We note that Devaney's initial motion for severance argued that Cohen's anticipated testimony would be antagonistic, not ____________ exculpatory. C. Reputation evidence C. Reputation evidence Cohen challenges the district court's ruling that he could not elicit evidence of his reputation for truthfulness and veracity until he had taken the stand. Irene Petri, a paralegal and secretary for Cohen's law firm, was called as a witness by both the government and Cohen. Cross-examining Petri during the government's case, counsel for Cohen asked whether she had formed an opinion about Cohen's reputation for truthfulness and veracity. The district court sustained the government's objection and instructed counsel to "[m]ove on." At sidebar, the court explained: Mr. Zalkind, first, I don't take kindly to your trying to get reputation evidence from this witness before your fellow's testified. His reputation's not at issue here, he has to take the stand before his reputation for truth and veracity is at issue. -21- 21 Cohen never took the stand. He made no attempt to revisit the issue when he called Petri as a defense witness, and he called none of the character witnesses on his trial list. In fact, he failed to raise the issue in several post-trial motions for new trial and acquittal. Seven months after the trial and on the eve of sentencing, Cohen moved for release pending appeal and raised the issue for the first time. The government concedes that even if a criminal defendant does not testify, evidence of his truthfulness and veracity may be admitted where such character traits are "pertinent" to the case. See Fed. R. Evid. 404(a)(1); United ___ ______ States v. Lilly, 983 F.2d 300, 306 (1st Cir. 1992). But the ______ _____ erroneous ruling did not, as Cohen claims, "place[] an entire facet of the defense off-limits." Even before the government rested, the court openly questioned its prior ruling that Cohen should take the stand before recalling Petri to testify to statements he had made in her presence. "Suppose Mr. Cohen doesn't testify . . . . I'm hesitant to condition things on his testifying. He has an absolute right not to testify." True, the district court did not refer specifically to reputation testimony; but under these circumstances, the challenged ruling must be considered provisional, not final. In its order denying Cohen's motion for release pending appeal, the district court found the erroneous ruling -22- 22 harmless in light of "the ability of defense counsel to return to the issue and proffer such evidence afresh." We agree with this assessment. Counsel should have attempted to offer reputation evidence, either through Petri, whom he recalled, or the other character witnesses. Cf. United ___ ______ States v. Holmquist, 36 F.3d 154, 162-66 (1st Cir. 1994) ______ _________ (exclusion of evidence pursuant to a provisional in limine _________ pretrial order may be challenged on appeal only if the party unsuccessfully attempted to offer such evidence in accordance with the terms specified in the order); Earle v. Benoit, 850 _____ ______ F.2d 836, 847 (1st Cir. 1988) (preliminary ruling such as a ruling in limine does not excuse failure to make an offer of _________ proof). In short, Cohen abandoned the issue at trial. -23- 23 D. The striking of Huber's direct testimony D. The striking of Huber's direct testimony As counsel for Cohen was about to make his closing argument, the district court made the following ruling: "[T]hose things which Huber testified that Cohen said to him . . . I'm striking that out so don't argue what Cohen said to Huber. You may argue what Huber said to Cohen." Cohen claims that he would have taken the stand had he known that his statements to Huber would be stricken; the ruling thus deprived him of his right to testify in his own defense. We are not persuaded. The striking of Huber's testimony may have upset his trial strategy, but it did not render Cohen less able to testify. Cohen never moved to reopen the evidence so that he could take the stand. Under these circumstances, we see no deprivation of the right to testify in one's own defense. Before the conclusion of closing arguments, Cohen filed an affidavit stating that he "would have chosen to testify" had he known that his testimony was necessary for the admission of Huber's entire testimony. In his reply brief, Cohen argues that his affidavit was the "functional equivalent" of a motion to reopen evidence, assuming such a motion was required, and that the district court should have inquired whether Cohen wished to testify. Nothing in the affidavit or in counsel's arguments to the district court, however, suggested that Cohen still wished to take the stand. -24- 24 Cohen also argues that the stricken portion of Huber's testimony was admissible for the fact that it was made and for his state of mind, not for the truth of anything asserted. Any error in this evidentiary ruling was harmless. The jury was instructed that it could consider "the fact that Mr. Cohen went to Huber, the fact that he made disclosures to Mr. Huber . . . and the testimony of Mr. Huber about what he said to Mr. Cohen . . . ." The jury had heard from Vasapolle that the codefendants made several disclosures during their post-takeover meeting that apparently took Cohen by surprise. In light of Huber's admitted testimony that Cohen could not yet "reveal . . . this information, which had been received from these three persons as clients," the jury could have reconstructed the apparent purpose of Cohen's consultation. There was an adequate evidentiary basis for the jury to infer Cohen's then-existing state of mind, even assuming that the stricken part of Huber's testimony was admissible for that purpose. Indeed, counsel for Cohen argued this point in his closing as if the stricken testimony were still in evidence: This is a case of a lawyer who has now heard his clients admitting to crimes. What does he do next? What's his state of mind? . . . . [H]e then went to the . . . professor. And after having this long conversation with him, the professor told him you cannot disclose this information until such a time comes when maybe you may have to. -25- 25 The court's ruling striking the testimony of what Cohen said to Huber may not have come at an ideal time; but Huber's testimony seemed to catch everyone -- even counsel for Cohen -- by surprise.4 We conclude that the court's effort to control the fallout from its Bruton ruling did not ______ unduly prejudice Cohen's right to present his defense. E. Multiplicity of charges E. Multiplicity of charges Devaney argues that the indictment was multiplicitous in various ways. His first claim, that Count 1 (conspiracy) was multiplicitous with all of the substantive counts, ignores the principle that "conspiracy to commit an offense and the subsequent commission of that crime normally do not merge into a single punishable act." Iannelli v. ________ United States, 420 U.S. 770, 777 (1975). _____________ We think the other claims of multiplicity are similarly unfounded. The bank fraud counts (Counts 2-6) were not multiplicitous with each other, even though they relate to a single scheme to defraud, because separate trusts, trustees, properties, and sums of money were involved. Each loan transaction was a separate execution of the fraudulent scheme. United States v. Brandon, 17 F.3d 409, 421 n.8 (1st _____________ _______ Cir.), cert. denied, 115 S. Ct. 80 (1994). _____ ______  ____________________ 4. Counsel for Cohen: "Frankly, I never prepared the professor. I just said let's have your best memory. I saw him out here for about ten minutes and that was it. What he remembered was, quite frankly, pretty astonishing to me, he has an excellent memory." -26- 26 The money laundering counts were not multiplicitous with the bank fraud counts. Bank fraud and money laundering do not constitute a single offense within the meaning of the test of Blockburger v. United States, 284 U.S. 299 (1932). ___________ _____________ Money laundering (technically, an unlawful "monetary transaction") is defined as knowingly engaging "in a monetary transaction in criminally derived property . . . ." 18 U.S.C. 1957. There is no requirement that the defendant must have committed the crime (here, the bank fraud) from which the property was "derived." In fact, Congress "intended money laundering to be a separate crime distinct from the underlying offense that generated the money." United ______ States v. LeBlanc, 24 F.3d 340, 346 (1st Cir.), cert. denied, ______ _______ _____ ______ 115 S. Ct. 250 (1994). Finally, the four money laundering counts were not multiplicitous of each other merely because they flow from a single transaction that took place in a single day. The time period is of no moment. Each count charges a discrete "transfer . . . of funds" to a distinct payee "by, through, or to a financial institution" within the meaning of the statute. 18 U.S.C. 1957(f)(1). F. The sufficiency of evidence F. The sufficiency of evidence Devaney argues that the district court in effect acquitted him on Count 1 (conspiracy) when it made an evidentiary finding under Fed. R. Evid. 801(d)(2)(E) and -27- 27 United States v. Petrozziello, 548 F.2d 20 (1st Cir. 1977), _____________ ____________ that certain alleged coconspirator statements were not admissible against Devaney because the court did not "find by a fair preponderance of the evidence that Mr. Devaney is a co-conspirator in the overarching or big or continuing conspiracy . . . ." Petrozziello rulings are not findings on ____________ whether the evidence is sufficient for a count to go to the jury. See United States v. Pitocchelli, 830 F.2d 401, 403 ___ _____________ ___________ (1st Cir. 1987) (district court properly excluded coconspirator's hearsay statements while refraining from disturbing jury finding of conspiracy). The district court plainly held that there was sufficient evidence for the conspiracy charge against Devaney to go to the jury.5 Devaney argues that there was insufficient evidence to support his conviction on Count 1 (conspiracy), Counts 5-7 (bank fraud), and Count 19 (money laundering). In making this argument, he bears "the heavy burden of demonstrating that no reasonable jury could have found [him] guilty beyond a reasonable doubt." United States v. Innamorati, 996 F.2d _____________ __________ 456, 469 (1st Cir.), cert. denied, 114 S. Ct. 409 (1993). We _____ ______ review the evidence in the light most favorable to the  ____________________ 5. Because Devaney was never, as he claims, "functional[ly] . . . acquitt[ed]" of the conspiracy count, we need not address his claims of double jeopardy and collateral estoppel, or his contention that the Petrozziello ruling ____________ compelled a directed verdict of acquittal on the substantive counts of bank fraud. -28- 28 government, "drawing all plausible inferences in its favor and resolving all credibility determinations in line with the jury's verdict." Id. ___ 1. The overarching conspiracy 1. The overarching conspiracy The evidence against Devaney tended to show the following. Devaney owned a one-third interest along with Smith and Mangone in eleven of the trusts that had received "participation" loans.6 He also owned a one-third interest in some of the trusts that were involved in sham "rollover" sales. In all, Devaney received nearly one million dollars in excess proceeds from the fraudulent loans. Devaney, the only outsider to the credit unions, was valuable to the conspiracy precisely because he was an outsider. Devaney's role in the conspiracy can be summarized as follows: he (1) identified the target properties and negotiated for their purchase by Mangone, Smith, and himself; (2) falsely represented that he and his wife were the sole owners of trusts that were jointly owned by Smith and Mangone; (3) signed purchase and sale agreements with inflated purchase prices that were submitted to BCCU; (4) recruited putative borrowers, and signed indemnification agreements assuring them that they would not be liable for loans; (5) concealed from Digital's loan officer the fact  ____________________ 6. Participation loans were loans administered by BCCU and largely funded by Digital, the "participating" institution. These loans ranged from $1,200,000 to over $4,000,000. -29- 29 that Mangone, president of Digital, was a beneficiary of one of the trusts; and (6) signed a purchase and sale agreement as the purported buyer in a rollover sale from one trust to another. From this evidence, the jury reasonably found that Devaney provided the "front" for the grand conspiracy. 2. Bank fraud 2. Bank fraud In light of the district court's Petrozziello ____________ finding, Devaney argues that certain (unspecified) statements and acts of his alleged coconspirators should have been excluded from the case against him, leaving insufficient evidence to support his conviction of bank fraud. This argument is made in so perfunctory a manner that it must be deemed abandoned. Zannino, 895 F.2d at 17. Devaney makes no _______ effort to isolate any evidence erroneously admitted against him, or to show that the district court's limiting instructions were somehow inadequate. Devaney argues that he made no material misrepresentation under 18 U.S.C. 1344(2) because neither credit union had a written policy requiring the disclosure of trust beneficiaries.7 We agree that 1344(2) requires a  ____________________ 7. 18 U.S.C. 1344 provides: "Whoever knowingly executes, or attempts to execute, a scheme or artifice -- (1) to defraud a financial institution; or (2) to obtain . . . moneys . . . [from] a financial institution, by means of false or fraudulent pretenses, representations, or promises; [shall be guilty of an offense against the United States]." Although we have held that -30- 30 material misrepresentation. See, e.g., United States v. ___ ____ ______________ Davis, 989 F.2d 244, 247 (7th Cir. 1993); United States v. _____ _____________ Sayan, 968 F.2d 55, 61 n.7 (D.C. Cir. 1992). Devaney _____ nonetheless misses the forest for the trees. It is inconceivable that the inflated loans would have been issued had the credit unions known, not only the identity of the true owners of the trusts (the only misrepresentation Devaney addresses), but also the true purchase price of the properties, and the fact that one of the loans for which Devaney was convicted was used to finance a sham "rollover" sale between two of his trusts. There was sufficient evidence to show that Devaney "made false statements or misrepresentations to obtain money" from the credit unions. Brandon, 17 F.3d at 424 (explaining 18 U.S.C. 1344(2)). _______ 3. Money laundering 3. Money laundering Devaney argues that the evidence did not show that he knowingly engaged in a monetary transaction involving criminally derived funds, i.e., the proceeds from the ____ fraudulent loan to the Curtis Village Realty Trust II. He claims that the loan proceeds at issue came from an earlier, legitimate loan to the Curtis Village trust -- not from the fraudulent BCCU loan.  ____________________ 1344(1) does not require a material misrepresentation, United ______ States v. Fontana, 948 F.2d 796, 802 (1st Cir. 1991), the ______ _______ district court did not so instruct the jury, and we do not rely upon 1344(1) here. -31- 31 We have already upheld Devaney's conviction on the parallel count of bank fraud, see supra, and we now reject ___ _____ Devaney's argument of mistaken identity. The government's financial auditor traced the proceeds from the BCCU loan to a $100,000 check payable to Devaney. Thus, the jury reasonably found that Devaney had received funds that were "criminally derived." 18 U.S.C. 1957(a). The jury also reasonably inferred that Devaney "knowingly" received his share of the fraudulent loan. Id. ___ G. Waiver of motion for mistrial G. Waiver of motion for mistrial Devaney asserts that he was denied due process because the district court held two conferences on his motion for mistrial in his absence and accepted his waiver of possible mistrial despite telltale signs that the waiver was not intelligent, voluntary, and knowing. As a threshold matter, we doubt that the Due Process Clause prohibits counsel from waiving a pending _______ motion for mistrial on behalf of an absent defendant. Devaney waived, not a mistrial ruling in hand, but one in the bush. Moreover, the record does not show whether Devaney was in fact absent from the courtroom when counsel entered the waiver, or whether he made an informed decision after full consultation with counsel. Devaney's extra-record allegations are more properly made to the district court as part of a claim of ineffective assistance of counsel. We see -32- 32 no due process violation in the district court's acceptance of the waiver. -33- 33 H. Ineffective assistance of counsel  H. Ineffective assistance of counsel Lacking a sufficiently developed record with respect to the waiver of mistrial, as well as trial counsel's alleged conflict of interest, we think that Devaney's claim of ineffective assistance should first be raised in the district court. See United States v. Daniels, 3 F.3d 25, 26- ___ _____________ _______ 27 (1st Cir. 1993). I. Jury instructions I. Jury instructions Cohen challenges the jury instructions on various grounds. 1. Duty to disclose 1. Duty to disclose Cohen argues that the district court erred in instructing the jury that "failure to disclose a material fact may . . . constitute a false or fraudulent misrepresentation" under 18 U.S.C. 1344 if the defendant was under "a general professional or specific contractual duty to make the disclosure," knew that the disclosure had to be made, and failed to make the disclosure with the specific intent to defraud. In United States v. Cassiere, 4 F.3d 1006, 1022-23 _____________ ________ (1st Cir. 1993), we approved a virtually identical instruction regarding duty to disclose. Cohen argues that the instruction was erroneous in this case because there was no evidence regarding an attorney's duty of disclosure, and because the jury may have confused Cohen's efforts to protect -34- 34 the confidence of his clients with acts of fraudulent misrepresentation. These objections, which are unique to Cohen's defense, were not preserved below. We therefore review the instruction only for plain error. See Fed. R. Crim. P. 30 ___ (grounds for objection to charge must be stated distinctly); United States v. O'Connor, 28 F.3d 218, 220-21 (1st Cir. ______________ ________ 1994). The instruction regarding duty to disclose was not plainly erroneous, if it was erroneous at all. Cohen surmises that the jury "punished" him for withholding privileged client information from federal regulators. A more plausible explanation of the verdict, one that does not presume jury confusion, is that Cohen was convicted on the evidence of his affirmative misrepresentations. 2. Fraudulent intent 2. Fraudulent intent In United States v. Gens, 493 F.2d 216, 222 (1st _____________ ____ Cir. 1974), which involved willful misapplication of funds by a bank officer under 18 U.S.C. 656, we held that "where the named debtor is both financially capable and fully understands that it is his responsibility to repay, a loan to him cannot -- absent other circumstances -- properly be ____________________________ characterized as [illegal], even if bank officials know he will turn over the proceeds to a third party" (emphasis added). Invoking Gens in the bank fraud context, Cohen ____ -35- 35 argues that the district court erred in not giving a proposed instruction that would have required proof that -- the trustee who made the representation and who signed individually as the borrower or guarantor on the loan did not believe that the credit union could look to him for payment of any deficiency on the loan, and the particular defendant you are considering was responsible for giving the trustee that belief. The trustee's belief, and the defendant's assurances of non- liability, would certainly constitute evidence of bank fraud; such evidence, however, is not an element of the offense. See United States v. Brennan, 994 F.2d 918, 924 n.14 (1st ___ _____________ _______ Cir. 1993) (explaining Gens; absence of evidence of ____ assurances to the named debtor would not mandate reversal under misapplication statute). The district court did not err in refusing to give the requested instruction. Moreover, "other circumstances," including the dual sets of certificates of beneficial interest found in Cohen's files, support the jury finding of fraudulent intent. Gens, 493 ____ F.2d at 222. 3. Willful blindness 3. Willful blindness Cohen argues that the district court should have corrected the prosecutor's closing argument regarding his willful blindness. During the March 23, 1991 meeting at Cohen's office, Vasapolle asked how she could explain the fake trustee financial statements in BCCU's files. Cohen, who was unaware of these statements, became upset and said, -36- 36 "I don't think I want to hear this." Cohen then "got up and left and took a walk." In his closing, the prosecutor argued that Cohen's conduct illustrated his willful blindness. Cohen made an objection, but only after the prosecutor had moved on to a more general illustration. Even if the objection was preserved, we see no error in permitting the argument of willful blindness. Vasapolle testified that during the same meeting, Cohen explained that "the only thing he [Cohen] could do" to protect the conspirators "would be to take the certificate of beneficial interests out of the file . . . . And he did agree to take them out." The jury could have inferred from this evidence that Cohen pledged to do his part to conceal the conspiracy, and then deliberately walked out to avoid hearing the plans of his coconspirators. 4. Trust provisions 4. Trust provisions The district court instructed the jury that under Massachusetts law, there is nothing inherently wrong or improper about using nominee trusts to buy and sell real estate: A trust is a legal instrument. Its terms are intended to govern the conduct of the participants. To violate these terms isn't a crime. Civil liability may attach, but it's not a crime. But you may consider any evidence of violating or ignoring the terms of a trust as bearing on the intent of the person you're considering with respect to the crimes charged. -37- 37 Cohen argues that the district court erred by refusing to instruct the jury that "a written contract could be changed any time by the parties orally." The district court also rejected a requested instruction that "oral changes in [trust] membership are permissible." We see no error in this decision. Even assuming that beneficial interests in a real estate nominee trust can be orally conveyed, the district court's instruction is not contrary: a legitimate oral modification of a trust is not evidence that the defendants "violat[ed] or ignor[ed] the terms of a trust." At any rate, there was no evidence of any oral modification, and the district court was not required to give a proposed instruction merely because it would have been more favorable to the defendant. 5. Reasonable doubt and presumption of innocence 5. Reasonable doubt and presumption of innocence Invoking the Supreme Court's recent decision in Victor v. Nebraska, 114 S. Ct. 1239 (1994), Cohen argues that ______ ________ the district court should have explained the concept of reasonable doubt to the jury. Victor is consistent with our ______ holding in United States v. Olmstead, 832 F.2d 642, 646 (1st _____________ ________ Cir. 1987), cert. denied, 486 U.S. 1009 (1988), that district _____ ______ courts need not define the concept of reasonable doubt so long as the phrase is not buried as an aside. See United ___ ______ States v. Neal, 36 F.3d 1190, 1202-04 (1st Cir. 1994) ______ ____ (reviewing recent Supreme Court decisions). The Constitution -38- 38 "neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course." Victor, 114 S. Ct. at 1243 (citations omitted). ______ Cohen also argues that the district court erred by refusing to reinstruct the jury on the presumption of innocence at the end of the case. Although the closing instruction on presumed innocence could have been more explicit, the totality of the instructions assures us that the jury did not "retire[] to deliberate less than fully aware of the presumption of innocence." United States v. Van _____________ ___ Helden, 920 F.2d 99, 102 (1st Cir. 1990) (quoting United ______ ______ States v. Ruppel, 666 F.2d 261, 274-75 (5th Cir.), cert. ______ ______ _____ denied, 458 U.S. 1107 (1982)). The district court repeatedly ______ stated that the government bore the burden of proving its case beyond a reasonable doubt; gave a forceful opening instruction on the presumption of innocence; reminded the jury at the end of the case that each of the defendants "started the trial presumed innocent"; and admonished the jury that to treat the indictment as evidence against the accused would be to "violate your oath as jurors." J. Cumulative error J. Cumulative error Cohen argues that the cumulative impact of his assigned errors requires reversal, even if the individual errors do not. Because we have found no abuse of discretion in the denial of Cohen's motion for severance, and harmless -39- 39 error, if error at all, only in the striking of Huber's direct testimony, the argument of cumulative error fails. See Brandon, 17 F.3d at 456 (rejecting similar argument where ___ _______ review of trial proceedings as a whole revealed no "pervasive unfairness or any error or combination of errors that deprived defendants of due process"). K. Sentences K. Sentences 1. Aggravating role 1. Aggravating role Cohen argues that the district court clearly erred in finding that he was a supervisor or manager of extensive criminal activity. See U.S.S.G. 3B1.1(b). In United ___ ______ States v. Ovalle-Marquez, 36 F.3d 212, 225 (1st Cir. 1994), ______ ______________ cert. denied, 1995 WL 21668, we noted that a defendant "is a _____ ______ manager or supervisor where he 'exercised some degree of control over others involved in the commission of the crime or he [was] responsible for organizing others for the purpose of carrying out the crime'" (quoting United States v. Fuller, _____________ ______ 897 F.2d 1217, 1220 (1st Cir. 1990)). To warrant the three- level adjustment under 3B1.1(b), "the defendant . . . must have 'organize[d] at least one [other] criminally responsible individual.'" United States v. Dietz, 950 F.2d 50, 53 (1st _____________ _____ Cir. 1991) (dictum) (quoting United States v. DeCicco, 899 _____________ _______ F.2d 1531, 1537 (7th Cir. 1990) (internal citation omitted)). The district court found that Cohen had "organized" Vasapolle. Vasapolle testified that Cohen instructed her -40- 40 regarding the mechanics of the participation loans -- for example, what documents to include in the BCCU files, and what checks to issue following a closing. These acts, which Cohen calls "ministerial," were not illegal per se, but they ______ were performed under Cohen's instruction by someone who was unquestionably a knowing participant in the crime. Bank fraud by nature rests upon ministerial acts. The district court's finding that Cohen "organized" Vasapolle was not clearly erroneous. We feel compelled to make one clarification. The prosecutor seriously distorted the record during the sentencing hearing when he suggested that Cohen told Vasapolle to "get [the blank certificates of beneficial interest] signed." Vasapolle testified that she was instructed by Mangone to obtain a short form certificate of beneficial interest from Cohen. Mangone -- not Cohen -- asked her to fill out the certificates with the names of the trustees and their spouses. Before the prosecutor made his ______ misrepresentation, however, the district court had already found Cohen to be a manager or supervisor. The court also properly rejected the government's recommendation of a four- level adjustment for an "organizer or leader," based on evidence that Mangone had the greater control over Vasapolle. 2. Ex post facto clause 2. Ex post facto clause _____________ -41- 41 Cohen argues that the district court violated the ex post facto clause of the Constitution by imposing a four- ______________ level enhancement under U.S.S.G. 2F1.1(b)(6)(A) for conduct jeopardizing the safety and soundness of a financial institution. "Barring any ex post facto problem, a defendant _____________ is to be punished according to the guidelines in effect at the time of sentencing." United States v. Harotunian, 920 ______________ __________ F.2d 1040, 1041-42 (1st Cir. 1990). Section 2F1.1(b)(6)(A) took effect on November 1, 1990, after all of the loans described in the indictment had closed. The conspiracy to defraud charged in Count 1, however, allegedly extended into March 1991; and the district court found that Cohen's "criminal conduct" -- meaning the charged conduct of which he was convicted -- "continued well after the enactment of these guidelines." See United States ___ _____________ v. Bennett, 37 F.3d 687, 699 (1st Cir. 1994) (distinguishing _______ charged conduct from relevant conduct for ex post facto ______________ purposes). There was evidence that in early 1991, Cohen actively misled BCCU regarding the status of the New Adventures Realty Trust loan. Because the offense of conviction continued after November 1, 1990, the district court did not violate the ex post facto clause by applying  ______________ 2F1.1(b)(6)(A). See United States v. Arboleda, 929 F.2d 858, ___ _____________ ________ 870-71 (1st Cir. 1991). -42- 42 Cohen argues that the relevant question is not when his offense of conviction ended, but whether any of his criminal acts after November 1, 1990 substantially jeopardized the safety and soundness of a financial institution. Assuming that Cohen has correctly framed the question, we think the four-level enhancement was still proper. By trying to throw BCCU and federal regulators off the scent, Cohen substantially jeopardized their ability to detect and recoup bad loans that BCCU had already made. 3. Double counting 3. Double counting Cohen argues that the district court engaged in improper "double counting" under the guidelines when it made upward adjustments for more than minimal planning (two levels), supervisory role (three levels), abuse of position of trust (two levels), jeopardizing the soundness of a financial institution (four levels), and the amount of loss (fifteen levels). "[I]n the sentencing context double counting is not rare -- and the practice is often perfectly proper." United States v. Pierro, 32 F.3d 611, 622 (1st Cir. _____________ ______ 1994), cert. denied, 63 U.S.L.W. 3539 (1995). Cohen makes no _____ ______ effort to show that double counting in fact occurred, or that either "an explicit prohibition against double counting []or a compelling basis for implying such a prohibition exists" in his case. United States v. Lilly, 13 F.3d 15, 19 (1st Cir. _____________ _____ 1994) (noting that "several [guideline] factors may draw upon -43- 43 the same nucleus of operative facts while nonetheless responding to discrete concerns"). Accordingly, we deem the argument waived. Zannino, 895 F.2d at 17. _______ -44- 44 4. Obstruction of justice 4. Obstruction of justice Smith argues that the district court erred in making a two-level adjustment for obstruction of justice under U.S.S.G. 3C1.1. The court based its decision on Smith's destruction of certain documents. According to Vasapolle, Smith stated that "he was going to burn [his closing books] in his fireplace." The government also recovered two pages from a document that Smith had thrown away, including the face page of a purchase and sale agreement on which the price had been changed with correction fluid. On these facts, the district court's finding that Smith in fact intentionally destroyed documents was not clearly erroneous. Smith also argues that the documents he discarded were merely copies of other documents already obtained by the government, and therefore immaterial to his case. Smith overlooks the purchase and sale agreement, which is unique, material evidence of his participation in the bank fraud. See U.S.S.G. 3C1.1, comment. (n.5) (evidence is material if ___ it "would tend to influence or affect the issue under determination"). 5. Downward departure 5. Downward departure Smith argues that the district court should have considered a downward departure based on, among other things, the multiple causes of the monetary loss ascribed to him. -45- 45 Smith makes no claim that the district court mistakenly believed it lacked the authority to depart downward. We therefore have no jurisdiction to review its refusal to do so. United States v. Hernandez, 995 F.2d 307, 314 (1st _____________ _________ Cir.), cert. denied, 114 S. Ct. 407 (1993). _____ ______ 6. Restitution 6. Restitution Devaney argues that the district court abused its discretion when it ordered him to pay restitution "not to exceed ten million dollars." The district court was required to consider the financial resources of the defendant and his earning ability, among other factors. See 18 U.S.C.  ___ 3664(a); United States v. Springer, 28 F.3d 236, 239 (1st ______________ ________ Cir. 1994). In his allocution, Devaney attested to his past success as a developer of million-dollar properties. This implies substantial (if now diminished) earning ability. Although the court found that Devaney "doesn't have any money," it noted that Devaney had "ke[pt] his ill-gotten gains." Significantly, the exact amount and schedule of restitution were left open by the district court. In framing a flexible order that can respond to Devaney's changing financial status, the district court did not abuse its considerable discretion. See United States v. Lombardi, 5 ___ _____________ ________ F.3d 568, 573 (1st Cir. 1993). -46- 46 III. CONCLUSION III. CONCLUSION __________ The defendants' convictions and sentences are Affirmed. Affirmed. _________ -47- 47